IN THE UNITED STATES BANKRUPTCY COURT FOR THE
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN RE: <br> Ben F. Blanton Construction, Inc. <br><br> Debtor. | ) Case No. 20-43555 <br> ) <br> ) Chapter 11 <br> ) <br> ) Hearing Date: July 22, 2020 <br> ) Hearing Time: 2:00 p.m. <br> ) Hearing Location: Courtroom 7 South |

**DECLARATION OF JEFF BLANTON,
PRESIDENT OF BEN F. BLANTON CONSTRUCTION, INC.
IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Jeff Blanton, do hereby declare, under penalty of perjury, that:

1. I serve as the President of Ben F. Blanton Construction, Inc. the debtor and debtors in possession in the above-captioned cases (collectively, the "Debtor" or "Blanton").

2. In my capacity as President, my responsibilities include overseeing Blanton's operations and financial activities including, monitoring cash flow, business relationships, workforce issues and financial planning. In this capacity, I have been extensively involved in the events leading up to the commencement of these chapter 11 cases. I have detailed knowledge of, and experience with, Blanton's businesses, financial affairs, day-to-day operations, books and records and the construction industry in which Blanton operates.

3. On July 16, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, codified as new 11 U.S.C. §§ 1181-1195 (the "Bankruptcy Code").

4. I submit this declaration (this "Declaration") in support of the Petition and to provide an overview of Blanton, the events leading up to the Petition Date, the relief requested in various motions and applications (the "First Day Motions") filed herein, and in support of

32926661v.1

Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing Pursuant, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief (the "DIP Motion").

5. Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees with responsibility for the relevant business and corporate matters, or my opinion based upon experience, knowledge, and information concerning Blanton. I am authorized to submit this declaration on behalf of the Debtor, and if called upon to testify, I would testify to the facts set forth herein.

I. **OVERVIEW**

A. **Business Introduction, History, and Overview.**

6. The Debtor is a 47-year-old construction management, design/build, and general contracting company with headquarters in the greater metropolitan St. Louis, MO area. The company began operations in 1970 as a residential builder and then moved into commercial construction. The Debtor has completed a great number of both chain and independently owned fast food and family dining restaurants, gas & convenience stores and a wide variety of retail stores. After two decades of successful commercial building the Debtor sought additional types of building to satisfy the need for diversity within the building profession. The Debtor currently provides a wide range of services which includes, pre-construction, general contracting, construction management, along with design/build and build to suit construction for industrial,

commercial, retail, education/ institutional, senior care and federal/state markets, and had nearly $30,000,000 in revenue during its last fiscal year.

## II. OVERVIEW OF BLANTON'S FINANCIAL POSITION AND PREPETITION DEBT STRUCTURE

7. Blanton generated total consolidated operating revenues of approximately $30 million for the fiscal year ending October 31, 2019, and prior to the impact of COVID-19 was on track for $30 million in revenue for the upcoming fiscal year. As a result of delayed and cancelled contracts, Blanton projects revenue of $25 million for this fiscal year.

8. As of the Petition Date, Blanton has approximately $2.5 million in total secured debt obligations, and approximately $3.4 million in unsecured, non-contingent claims. Blanton also has significant obligations to insiders and former shareholders.

9. The pre-petition credit agreement with Enterprise Bank (the "Credit Agreement") provides for a revolving credit facility in the amount of $4,000,000.00, secured by, among other items (a) liens on substantially all of Blanton's assets, and (b) guarantees of Jeff Blanton and others, together, the "Prepetition Collateral"). The Credit Agreement bears interest at the London Interbank Offered Rate ("LIBOR"), plus 3.5% per annum, with a 5.0% floor.

10. As set forth above, Blanton had approximately $3.4 million in ordinary course trade debt owed to various vendors, suppliers, and servicers that was unpaid as of the Petition Date. A portion of such trade debt is associated with specific executory contracts which are the subject to the Motion to Assume Executory Contracts and Pay Subcontractors Claims Associated Therewith.

32926661v.1

### III. EVENTS LEADING TO BLANTON'S CHAPTER 11 CASES

#### A. Adverse Market Conditions and Commercial Disputes.

11. As noted above, Blanton in the commercial construction industry. While the Debtor's business has been historically profitable, the effects of COVID-19 has reduced the projected profits for the current fiscal year.

12. Further, as may happen with construction companies, disputes arise with owners, subcontractors, bonding companies and insurers. Blanton was recently involved in such a dispute and is subject to significant monetary exposure and there are time consuming legal issues and disputes over the extent of insurance coverage, which the Debtor believed would be best addressed in Chapter 11 Case, codified as new 11 U.S.C. §§ 1181-1195.

### IV. RELIEF SOUGHT IN THE FIRST DAY PLEADINGS

13. Contemporaneously herewith, the Debtor has filed a number of first day pleadings seeking relief that the Debtor believes are necessary to enable it to efficiently administer the estate with minimal disruption and loss of value during its reorganization. The Debtor requests that the relief requested in each of the first day motions is granted as critical elements in ensuring the maximization of value of the Debtors' estates.

14. I have reviewed each of the first day pleadings. The facts stated therein are true and correct to the best of my information and belief, and the relief sought in each of the first day pleadings is necessary to enable the Debtor to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully restructuring the business.

A. **Debtors' Motion Seeking Entry of an Order (I) Scheduling an Expedited Hearing on First Day Motions Filed by the Debtors, (II) Approving the Form and Manner of Notice Thereof, and (III) Granting Related Relief (the "Expedited Hearing Motion").**

15. The Debtor will request entry of an order (a) scheduling an expedited hearing on certain of the First Day Motions and (b) approving the First Day Notice. I believe that expedited relief is essential to maintaining the normal day-to-day operations of the Debtor's business and is necessary to preserve and maximize the value of Debtor's estate.

B. **Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using The Cash Management System and (B) Maintain Existing Bank Accounts and Business Forms and Books and Records; and (II) Granting Related Relief (the "Cash Management Motion").**

16. Pursuant to the Cash Management Motion, the Debtors seek the entry of interim and final orders authorizing, but not directing, the Debtors to (a) continue to operate the Cash Management System, (b) honor certain prepetition obligations related thereto, and (c) maintain existing business forms.

17. The Cash Management System is vital to the Debtors' ability to conduct business. Any disruption of the Cash Management System would have an immediate adverse effect on the Debtor's business and operations to the detriment of its estate. Accordingly, to minimize disruption caused by this chapter 11 case and to maximize the value of the Debtor's estate, the Debtor requests authority to continue to utilize its existing Cash Management System during the pendency of this chapter 11 case.

18. As part of their Cash Management System, the Debtor utilized various preprinted and electronic business forms including checks, letterhead, correspondence forms, invoices,

purchase orders, and other business forms in the ordinary course of business (collectively, and as they may be modified from time to time, the "Business Forms"). To minimize expenses to its estate and avoid confusion during the pendency of this chapter 11 cases, the Debtor should be permitted to use its currently existing Business Forms as such forms were in existence immediately before the Petition Date, without reference to the Debtor's status as a debtor in possession, rather than requiring the Debtor to incur the expense and delay of ordering entirely new business forms.

19.  I believe that the relief requested in the Cash Management Motion is essential to the continued operation of the Debtor's business and denial of such relief would severely disrupt, the Debtor's business. I further believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estates, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business in chapter 11. Accordingly, on behalf of the Debtor, I respectfully submit that the Court should approve the Cash Management Motion.

    C.    **<u>Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief (the "Wages Motion").</u>**

20.  Pursuant to the Wages Motion, the Debtor seeks entry of interim and final orders authorizing, but not directing, the Debtor to (a) pay prepetition wages, salaries, other compensation, and reimbursable expenses and (b) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto.

21.     As of the Petition Date, the Debtors employ 23 individuals which perform a wide variety of functions critical to the administration of this chapter 11 case and to preserving operational stability and efficiency. In many instances, the employees include personnel who are intimately familiar with the Debtor's business and pending contracts, and have developed relationships with subcontractors and property owners that are essential to the Debtor's business. These individuals cannot be easily replaced. Without the continued, uninterrupted services of the employees, the ability of the Debtor to maintain and administer its estates will be materially impaired. Consequently, the relief requested herein is necessary and appropriate.

21.     While the majority of the Debtors' employees are not represented by a labor union, the Debtor is a party to a collective bargaining agreement with the carpenters union which represents several of the employees. With respect to these employees, the Debtor seeks authority (but not direction) to continue to provide compensation and benefits in the ordinary course of business and consistent with past practice.

22.     To minimize the personal hardship that the employees would suffer if employee obligations are not paid when due or as expected, the Debtor seeks authority to pay and honor the Employee Compensation and Benefits (as defined in the Wages Motion).

23.     I believe that paying prepetition wages, employee benefits, and additional obligations will benefit the Debtor's estate and its creditors by allowing the Debtor's business operations to continue without interruption.  Indeed, without the relief requested herein, I believe employees may seek alternative employment opportunities, perhaps with the Debtor's competitors. Such a development would deplete the Debtor's workforce, thereby hindering the Debtor's ability to operate its business and, likely, diminishing stakeholder confidence in the

Debtor's ability to successfully reorganize. There can be no doubt that the Debtor must do its utmost to retain their workforce by, among other things, continuing to honor all wage, benefits, and additional obligations, including the prepetition Employee Compensation and Benefits. Accordingly, on behalf of the Debtor, I respectfully submit that the Court should approve the Wages Motion.

### D. Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, and (B) Renew, Supplement, or Purchase Insurance Policies, and (II) Granting Related Relief (the "Insurance Motion").

24. Pursuant to the Insurance Motion, the Debtor seeks entry of interim and final orders authorizing the Debtor to (a) continue insurance coverage entered into prepetition and satisfy prepetition obligations related thereto in the ordinary course of business and (b) renew, supplement, or purchase insurance coverage in the ordinary course of business on a postpetition basis.

25. In the ordinary course of business, the Debtors maintains several insurance policies (the "Insurance Policies") administered by multiple third-party insurance carriers. The Insurance Policies provide the Debtors with coverage for, among other things, the Debtors' property, contractors equipment, installation, riggers liability, professional/pollution liability, commercial general liability, automobile liability, and workers compensation liability. In addition, the Insurance Policies include an umbrella policy.

26. I believe that continuation of the Insurance Policies and entry into new insurance policies as required in the ordinary course of business is essential to the preservation of the

32926661v.1

value of the Debtor's properties and assets. Further, I believe that continuation of the services of the brokers is necessary to assure the Debtor's ability to secure Insurance Policies on advantageous terms at competitive rates, facilitate the proper maintenance of the Debtor's Insurance Policies postpetition, and ensure adequate protection of the Debtor's property postpetition. Accordingly, on behalf of the Debtor, I respectfully submit that the Court should approve the Insurance Motion.

### E. Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Executory Contracts, (II) Pay Pre Petition Claims of Subcontracts Associated Therewith, and (III) Granting Related Relief (the "Executory Contracts Motion").

27. By the Executory Contracts Motion, the Debtor seeks entry of interim and final orders (a) authorizing the Debtor to assume the Executory Contracts by and among the Debtor and the counter parties described therein; (b) authorizing and approving the payment to subcontractors associated therewith.

28. The Debtor's management team has analyzed the pending construction contracts to determine their profitability as well as the potential liabilities to the Debtor in the event such contracts were to be rejected by the Debtor.

29. The Debtor has determined that (a) the assumption of executory contracts as identified in the Executory Contracts Motion and the payment of the subcontractor claims associated therewith is necessary (i) for a seamless and efficient continuation of the contracts, (ii) to maximize the value of said contracts to the Debtor's operations; and (iii) to enable the Debtor to continue its ability to secure new contracts. Therefore, the Debtors seek to assume the executory contracts and allow the Debtor to continue to perform under such contracts uninterrupted by this proceeding.

32926661v.1

30. I believe that the relief requested in the Executory Contracts Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business in chapter 11 without disruption and maximize value for all stakeholders. Accordingly, on behalf of the Debtor, I respectfully submit that the relief requested in the Executory Contracts Motion should be granted.

### F. Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Debtors to Continue and Renew Surety Bond Program and (B) Granting Related Relief (the "Surety Bond Motion").

31. By the Surety Bond Motion, the Debtor seek interim and final orders (a) authorizing the Debtor to maintain, continue, and renew, in its sole discretion, the Surety Bond Program (as defined herein) and to pay any obligations related thereto, consistent with past practices in effect before the Petition Date and (b) granting related relief.

32. In the ordinary course of their businesses, the Debtor is required, pursuant to the terms of certain contracts, to provide surety bonds (the "Surety Bonds," and their usage, the "Surety Bond Program") to third parties, to secure the Debtor's payment or performance of certain obligations under such construction contracts. I believe that the failure to provide, maintain, and timely renew or replace these surety bonds would jeopardize the Debtor's ability to perform under certain of their assumed executory contracts and compete for new contracts, which are essential to the Debtor's business operations, and may risk additional liability under applicable law.

33. The beneficiaries of these surety bonds (the "Obligees"), their issuers (the "Issuers"), their identification or policy numbers, and the total bond coverage amounts are described in the Surety Bond Motion.

34 The Surety Bonds issued on behalf of the Debtor are crucial to the Debtors' ability to conduct required ordinary course business operations

10

35. Accordingly, without providing, maintaining, or timely replacing the Surety Bonds, the Debtor cannot perform under contracts requiring such bonds.

36. The premiums for the Surety Bonds (the "Surety Bond Obligations") are determined annually and are paid by the Debtor at inception and quarterly thereafter. These Surety Bond Obligations are generally paid to the Debtors' Surety Broker (as defined herein), who then remits the payments to the appropriate Issuers.

37. As is customary, the Debtor has entered into indemnity agreements with the Issuers with respect to the Surety Bonds (collectively, the "Indemnity Agreements") to induce the Issuers to issue such bonds, pursuant to which the Debtors agreed to indemnify the Issuers from any loss, cost, damage, or expense they may incur by reason of the Issuers' issuance of the Surety Bonds on behalf of the Debtors.

38. The Debtors obtain a majority of their Surety Bonds through their broker, JW Terrill (the "Surety Broker"). The Surety Broker assists the Debtor with sourcing, evaluating, and paying the premiums for Surety Bonds, and negotiates with Issuers on behalf of the Debtors to obtain new or replacement Surety Bonds on favorable terms. The Debtor compensates the Surety Broker by paying a percentage fee based on the amount of procured surety bonds (the "Broker's Fees"). These Broker's Fees are paid to the Surety Broker as a portion of the Surety Bond Obligations, which the Surety Broker retains, and then remits the Surety Bond Obligations to the Issuers accordingly. As of the Petition Date, the Debtors do not believe they owe any prepetition Broker's Fees.

39. The nature of the Debtor's businesses makes it necessary for the Debtor to maintain its Surety Bond Program on an ongoing and uninterrupted basis. If any Surety Bonds lapse without renewal, or the Debtor is unable to obtain new Surety Bonds for certain purposes, the Debtor could default on various contractual obligations, which could severely disrupt or otherwise idle the Debtor's operations to the detriment of all parties in interest.

11

32926661v.1

40. Accordingly, I believe that the continuation of the Surety Bond Program, the payment of postpetition obligations arising under the Surety Bond Program, including in connection with either the maintenance or renewal of any existing Surety Bonds or the entry into new Surety Bonds, are therefore necessary to preserving the Debtor's businesses and the value of the Debtor's estate for all stakeholders.

41. Furthermore, I believe that the Surety Bond Program is ordinary for the type, size, and nature of the Debtor's business, and is accordingly also consistent with the reasonable expectations of creditors, who would expect the Debtor to continue complying with their obligations under law. Moreover, I believe that the Surety Bond Program is consistent with industry practice.

### G.  Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business (the "Ordinary Course Professionals Motion").

42. The Debtor employs various professionals in the ordinary course of business (the "Ordinary Course Professionals"), who render a wide range of services to the Debtors in a variety of matters unrelated to these chapter 11 cases, including litigation, real estate law, environmental law, regulatory law, labor and employment law, and other services for the Debtor in relation to the issues that have a direct and significant impact on the Debtor's day-to-day operations. In my opinion, it is essential that the employment of the Ordinary Course Professionals, many of whom are already familiar with the Debtor's business and affairs, be continued to avoid disruption of the Debtor's normal business operations.

43. I believe that the proposed employment of the Ordinary Course Professionals and the payment of monthly compensation in accordance with the procedures set forth in the Ordinary Course Professionals Motion (the "OCP Procedures") are in the best interest of the Debtor's estate and its creditors. The relief requested will, in my opinion, save the estates substantial expense associated with applying separately for the employment of each professional. Furthermore, I understand that the requested relief will save the estate the additional fees relating to the preparation and prosecution of

12

interim fee applications. Likewise, I believe the OCP Procedures outlined in the Ordinary Course Professionals Motion will relieve the Court, the U.S. Trustee and any Subchapter V Trustee the burden of reviewing numerous fee applications involving relatively small amounts of fees and expenses.

44. Accordingly, I believe that the retention and compensation the Ordinary Course Professionals in accordance with the OCP Procedures outlined in the Ordinary Course Professionals Motion is in the best interest of the Debtor's estates, their creditors, and all other parties in interest and should be approved on the terms and conditions described in the Ordinary Course Professionals Motion.

**H.    Debtors' Motion for Entry of an Order (A) Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Retained Professionals and (B) Granting Related Relief (the "Interim Compensation Procedures Motion").**

45. I believe the Debtor requires the assistance of experienced counsel to efficiently manage these proceedings to successfully and timely emerge from chapter 11. Accordingly, the Debtor has filed, an application with the Court to employ and retain Lathrop GPM, LLP as counsel to the Debtor.

46. I understand that the Debtor may need to retain additional estate professionals in connection with the continued prosecution of these chapter 11 cases (together with Lathrop GPM, LLP, the "Estate Professionals")

47. I believe that establishing orderly procedures (the "Interim Compensation Procedures") to pay the Estate Professionals and who will be required to file applications for allowance of compensation and reimbursement of expenses ("Fee Applications") will streamline the administration of this chapter 11 case and otherwise promote efficiency for the Court, and all parties in interest. Specifically, a streamlined process for serving interim fee applications and notices thereof is, in my opinion, in the best interest of the Debtor because it will facilitate efficient review of the Estate Professionals' fees and expenses while saving the Debtor unnecessary copying and mailing expenses.

48. Finally, I understand that the Debtor's request that the Court limit service of Fee Applications in the manner set forth in the Interim Compensation Motion is designed to ensure that such

13

32926661v.1

Fee Applications reach the parties most active in the chapter 11 case and save the expense of undue duplication and mailing that would result from serving every one of the Debtor's creditors. Moreover, I understand that many parties in interest will receive copies of the Fee Applications through the Court's Electronic Case Files system. I believe that establishing a streamlined process for serving and providing notice of the Fee Applications is appropriate to provide the parties most active in this chapter 11 case the opportunity to review the Estate Professionals' fees and expenses while also saving the Debtor unnecessary administration costs.

49. I believe that the proposed Interim Compensation Procedures will enable the Debtor to closely monitor the costs of administration, forecast cash flows, and implement efficient cash management procedures. They also will allow the Court and key parties in interest, to ensure the reasonableness and necessity of the compensation and reimbursement requested.

I. **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing The Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief (the "DIP Motion").**

50. To finance this chapter 11 case, the Debtor has obtained a commitment from Enterprise Bank to make a $3.5 million loan pursuant to a senior secured, super-priority debtor-in-possession facility (the "DIP Credit Agreement") and an agreement regarding the consensual use of the collateral and cash collateral. The DIP Credit Agreement is a senior secured, super-priority, revolving credit facility in the principal amount of up to $3.5 million. priming liens and security interests on all of the Prepetition Collateral. Subject to closing of the DIP Credit Agreement and entry of a final order approving the DIP Credit Agreement, it also provides for the refinancing (or a "roll-up") of the Debtor's obligations under

the prepetition credit agreement with Enterprise Bank. The Debtor, in consultation with its professionals, have determined that the DIP Credit Agreement is the best option available and such DIP Credit Agreement was negotiated in good faith and at arms-length.

51. Pursuant to the DIP Motion, the Debtor seeks entry of interim and final orders approving the DIP Financing. Immediate access to incremental liquidity in the form of postpetition financing and access to Cash Collateral is critical to preserving the value of the Debtor's estates and maximizing the likelihood of a going-concern reorganization by sending a strong message to customers, vendors, employees, and stakeholders that their restructuring is both well-funded and well-positioned to succeed.

52. Access to the DIP Credit Agreement will instill much needed confidence in parties that are critical to the success of the chapter 11 case, including the Debtor's employees, vendors, customers and communities. I believe this greatly enhances the Debtor's ability to ensure the stability and success of its operations during the chapter 11 case, focus the Debtor's attention towards finalizing a Plan, and to prosecute this chapter 11 cases swiftly so as to maximize value for all parties in interest. The potential consequences to the Debtor of a failure to obtain adequate funding are dire: among other things, the Debtor could be unable to continue its operations, perform under its contracts, and pay their employees. The Debtor would be unable to maintain and grow valuable customer relationships. Such consequences would make successful prosecution of this chapter 11 case, or the confirmation of a plan of reorganization and would result in irreparable harm to the Debtor, its estate, and all parties in interest.

53. I believe that, subject to approval by the Court, the Debtor is qualified and authorized to enter into the DIP Credit Agreement. Specifically, Borrower (as defined in the DIP

Credit Agreement) is a corporation, validly existing and in good standing under the laws of the State of Missouri. Borrower has the power and authority to enter into and perform the Loan Documents (as defined in the DIP Credit Agreement) to which it is a party, has taken all necessary action to authorize the execution, delivery and performance of such Loan Documents, and has duly executed and delivered such Loan Documents. Furthermore, the execution and delivery by Borrower of the Loan Documents to which it is a party does not, and the performance by the Borrower of its obligations thereunder will not (a) result in a violation of the certificate of incorporation, bylaws, or other organizational documents of Borrower or (b) result in a violation of any order of the Court.

54. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the DIP Financing Motion should be granted.

**J.  Debtors' Motion Seeking Entry of Interim and Final Orders (I) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Services, (II) Determining Adequate Assurance of Payment for Future Utility Services, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Granting Related Relief (the "Utilities Motion")**

55. Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders: (a) prohibiting utility providers from altering, refusing, or discontinuing services; (b) determining adequate assurance of payment for future utility services; and (c) establishing procedures for determining adequate assurance of payment for future utility services.

56. In the ordinary course of their business and management of their properties, the Debtors obtain electricity, natural gas, water and sewage, telephone, internet, cable, and other similar utility services from eleven different utility providers. On average, the Debtors pay approximately $7,500 each month for the Utility Services.

32926661v.1

57. Preserving Utility Services on an uninterrupted basis is essential to the Debtors' interruption of Utility Services, even for a brief period of time, would seriously jeopardize the Debtor's operations, customer relationships, revenue and profits, and the Debtor's reorganization efforts. It is, therefore, critical that Utility Services continue uninterrupted during these chapter 11 cases. Accordingly, on behalf of the Debtor, I respectfully submit that the Court should approve the Utilities Motion.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

Pursuant to 28, U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Ben F. Blanton Construction, Inc

By: /s/ Jeff Blanton
    President

32926661v.1